STATE *EX REL.* GEORGE v. AIKEN.[1]

1. DISPENSARY ACT—STARE DECISIS.—The rule of *stare decisis* does not require

---

1 This case and next succeeding case, Melchers *v.* Bates, were heard in September, 1894, at an adjourned session of the April Term, Mr. Justice Gary being then in commission and present.

the court to affirm a decision which held the "Dispensary Act" of this State to be unconstitutional, if the Court is satisfied that such former decison was clearly erroneous.

2. IBID.—The Dispensary Act of 1893 (21 Stat., 430,) differs in some of its features from the Dispensary Act of 1892 (21 Stat., 62), but not in those features which the court in McCullough *v.* Brown, 41 S. C., 220, held sufficient to render the act of 1892 unconstitutional.

3. STATUTE—CONSTITUTION—COURTS.—The courts should not declare an act of the legislature to be unconstitutional unless clearly and manifestly so.

4. LIQUOR in its nature is dangerous to the morals, good order, health, and safety of the people, and is not to be placed on the same footing with the ordinary commodities of life.

5. IBID.—POLICE POWER—STATE MANAGEMENT.—The State, under its police power, can itself assume entire control and management of those subjects, such as liquor, that are dangerous to the peace, good order, health, morals, and welfare of the people, even when trade is one of the incidents of such entire control and management on the part of the State.

6. IBID.—IBID.—IBID.—The Dispensary Act of 1893, providing for a sale of liquor by the State alone, carefully regulating such sales, and excluding all other purchases and sales within the limits of this State, is a police measure, and a valid exercise of legislative power, even though there may be a possible revenue, and the restriction imposed might have been as well thrown around the liquor traffic in the hands of private persons.

7. DISPENSARY ACT—POLICE—TAXATION—MONOPOLY.—The Dispensary Act being a police measure, it violates none of the provisions of the Constitution of this State as to taxation or monopolies.

8. IBID.—SALE OF LIQUORS.—This statute does not violate section 1 of article I., as the sale of liquor is not an inalienable right.

9. LEGISLATIVE POWER—RESERVED RIGHTS.— The full legislative power vested in the General Assembly by article II., section 1, of the Constitution embraces the regulation of the liquor traffic, and is not affected by the declaration in article I., section 41, that "the enumeration of rights in this Constitution shall not be construed to impair or deny others retained by the people, and all powers not herein delegated remain with the people."

10. TRADE BY STATE—CASES CRITICISED.—A statute is unconstitutional if its purpose is to embark the State in a commercial enterprise, but not so if it is a police measure with trade simply as an incident to its proper regulation. Beebe *v.* State, 6 Ind., 501, disputed, and Rippe *v.* Becker, 57 N.W. Rep., 331, distinguished.

11. LIQUOR TRAFFIC—U. S. CONSTITUTION.—Matters properly within the police powers of a State, such as the liquor traffic, are not affected by the 4th, 5th, and 14th amendments to the Constitution of the United States.

12. IBID.—WILSON ACT—INTERSTATE COMMERCE.—The purpose and intent of the "Wilson Act" of the United States Congress was to deprive liquor of

its national character as a subject of commerce, make it local in its nature, and subject to the police power of the State, until Congress saw fit to legislate upon the subject. Therefore, the Dispensary Act is not an interference with interstate commerce, but all liquor upon its arrival in the State—whether "arrival" means the reaching of its destination or crossing the State boundary line—is subject to the provisions of this act.

13. CASES CRITICISED.—McCullough *v.* Brown, 41 S. C., 220, and other cases decided upon its authority, overruled.

MR. CHIEF JUSTICE McIVER, *dissenting*.

Before ALDRICH, J., Aiken, August, 1894.

This was an application made by J. V. George, county dispenser, and G. T. Holley, his clerk, for a writ of prohibition to restrain the mayor and aldermen of the city of Aiken from proceeding further in the trial of petitioners on the charge of selling liquor.

The attorney general and *Mr. R. W. Boyd*, for relators.

*Mr. G. W. Croft*, contra.

October 8, 1894. The opinion of the court was delivered by

MR. JUSTICE GARY. The issues involved in this case are far-reaching in their consequences, and of gravest moment. An act of the legislature, which has for its object the solution of the vexed question of the liquor traffic, is before this court for review, and its constitutionality is contested. The scheme of the act is novel in its features, and the court is not able to get much light from adjudications bearing directly thereon. We are, therefore, compelled, from necessity, to reach our conclusions upon a consideration of the general principles of law, on which it is founded. We trust that we enter upon the consideration of the principles involved in this case with a proper sense of the responsibility which rests upon us. The conclusions at which we have arrived, were reached after mature deliberation and careful consideration.

The issues involved herein will be seen more clearly by a short statement of facts, out of which the case arose. The relators, who were operating a dispensary by State appointment

and authority, under the act of the General Assembly approved. December 23, 1893, and known as the "Dispensary Act," having been summoned to answer before the town council of Aiken for violation of an ordinance prohibiting the sale of vinous or malt liquors without a license, applied before his honor, Judge Aldrich, for a writ of prohibition, restraining the town council from interfering with them upon said charge, on the ground that the ordinance was a nullity, and the council, in seeking to enforce it, was attempting to exercise a power with which it was not vested. The town council, in answer to a rule to show cause, justified its proposed action by an assertion of the validity of the ordinance in question, and by the claim that the Dispensary Act of 1893 was null and void, as violative of sections 1, 2, and 41, of article 1, of the Constitution of the State, of section 8, art. 1, of the Constitution of the United States, of amendments 4, 5, and 14 of that Constitution, and of the national laws regulating interstate commerce. It is also urged that the relators had ample remedy at law for the correction of their alleged grievances, and that the writ, on that ground, should not issue.

Judge Aldrich held, under the authority of *McCullough* v. *Brown*, 41 S. C., 220, that the act of 1893 was violative of the State Constitution, null and void; that the act is not in violation of the Constitution of the United States, the amendments thereto, or the interstate commerce laws of the United States; but that the charter of the city of Aiken does not sustain the ordinance, and that the same was illegal and void. He further overruled the objection that the relators had ample remedy at law, and ordered the writ of prohibition to issue. Both relators and respondents appealed—the first on the ground that the judge erred in holding the act of 1893 null and void, as violative of the State Constitution, and in permitting respondents to question the constitutionality of the act; and the respondents, on the grounds that the judge erred in not holding the Dispensary Act null and void, as violative of the Constitution of the United States and of the national interstate commerce laws, in not holding the relators had ample remedy at law, and so are

.not entitled to the writ, and in holding the ordinance in question to be without support of law, null and void.

We are met at the threshold with the objection that the principles involved in this case have been adjudicated by this court in the case of *McCullough* v. *Brown*, 41 S. C., 220, followed by the cases of *Barringer* v. *City Council*, and *Ex parte Brunson, Id.*, 501, and *State* v. *O'Donnell, Id.*, 553, and that the doctrine of *stare decisis* should prevail. The act of 1892, known as the "Dispensary Act," had been construed by the court before the case of *McCullough* v. *Brown* was decided. It received its first judicial construction by his honor, Judge Simonton, in the case of *Cantini* v. *Tillman*, in the Circuit Court of the United States for the District of South Carolina. 54 Fed. R., 969. In an able and clear opinion, his honor, Judge Simonton, sustained the constitutionality of the act generally, but reserved his opinion as to other provisions of the act in these words: "There are other and much more grave questions in this case, affecting the jurisdiction of this court. The conclusions reached render the discussion of them at this time unnecessary." In that case his honor, Judge Simonton, says: "This is a proceeding to test the constitutionality of an act of the General Assembly of South Carolina, commonly known as the 'Dispensary Act.' The purpose of the act, as expressed in its title, is to prohibit the manufacture and sale of intoxicating liquors as a beverage within this State, except as herein provided. * * * We have seen that the right to sell intoxicating liquors is not a right inherent in the citizen, and is not one of the privileges of citizenship; that it is not within the protection of the fourteenth amendment, that it is within the police power. The police power is a right reserved by the States, and has not been delegated to the General Government."

The act of 1892 was next brought in review before the Supreme Court of this State in the cases of *State ex rel. Hoover* v. *Town Council of Chester*, and *State ex rel. Groeschel* v. *Same*, 39 S. C., 307. In these cases (which were heard together) Mr. Justice Pope, in delivering the unanimous opinion of the court, says: "As to these several points embodied in these four objections, wherein it is claimed that the act we are now considering

is in violation of certain provisions of our Constitution as well as that of the United States, we do not see how such questions can arise in this case. The only question involved here is whether said act violates the Constitution, in forbidding the granting of licenses to retail spirituous liquors beyond the 30th day of June, 1893, and to that question we have confined our attention, and having reached the conclusion that the said act being in effect an act to regulate the sale of spirituous liquors, the power to do which is universally recognized, it is quite clear that there is nothing unconstitutional in forbidding the granting of licenses to sell liquor except in the manner prescribed by the act. But whether the act contains other features not affecting the right of relators to the licenses claimed by them, is a question that cannot properly arise in these cases, and cannot, therefore, be considered; for, as we have said above, it would be extrajudicial to do so." It will be observed that in those cases Mr. Justice Pope spoke for the court, when he said: "Having reached the conclusion that the said act being in effect an act to regulate the sale of spirituous liquors, the power to do which is universally recognized, it is quite clear that there is nothing unconstitutional in forbidding the granting of licenses to sell liquors, except in the manner prescribed by the act."

It will also be seen by an examination of those cases that the doctrine of *stare decisis* did not prevail when the cases of *State* v. *Platt*, 2 S. C., 150, and *State* v. *Hagood*, 13 S. C., 46, were brought in review before the court. Mr. Justice Pope, speaking for the court, says: "There have been two decisions by this court, and both most unsatisfactory, there having been a strong dissenting opinion in each—Chief Justice Moses in the case of *State* v. *Platt*, 2 S. C., 150, and the present Chief Justice in the case of *State* v. *Hagood*, 13 S. C., 46." After citing authorities to show that the principles announced in them were erroneous, he thus proceeds: "Therefore, however unpleasant it may be to reverse previous decisions of this court, still, after full and mature consideration, we feel it to be a duty we owe the State that the case of *State* v. *Platt, supra*, should be, and is hereby, overruled; and as the case of *State* v. *Hagood, supra*, was really decided upon the authority of Platt's case, it follows necessa-

rily that the case of Hagood must fall when the foundation
upon which it rests is taken away."

Chief Justice Simpson, delivering the opinion of the court
in *Suber* v. *Chandler*, 18 S. C., 526, overruling *McGowan* v. *Hitt*,
16 *Id.*, 602, uses this language: "The judgment which we pro-
pose to announce is directly in conflict with *McGowan* v. *Hitt*,
16 S. C,, 602. The case was decided by a divided court, Mr.
Justice McIver having dissented. It is a very recent decision.
Judge Pressley, delivering the opinion of the majority, stated
that in several of the States cases were found holding that the
statute was suspended in cases like that. * * * Under these
circumstances, and upon examination finding that it has no
sufficient support, either in principle or authority, in our opi-
nion, it should be overruled, and it is so ordered." In *Piester*
v. *Piester*, 22 S. C., 145, Mr. Justice McGowan, in overruling
*Edwards* v. *Sanders*, 6 S. C., 316, says: "This is the case upon
which the Circuit Judge rested his decree; but with all due
respect, and an anxious desire to maintain consistency in the
adjudications of this court, we are constrained to say that in
our judgment the case of *Edwards* v. *Sanders* is not only unsus-
tained by proper rules of construction, but is in direct oppo-
sition to the decided cases, and what was at that time considered
the settled law of the State."

In *Willis* v. *Owen*, 43 Tex., 41, the court said: "The questions
to be considered in these cases have no application whatever to
the title or transfer of property, or to matters of contract. They
involve the construction and interpretation of the organic law,
and present for consideration the structure of the government,
the limitations upon legislative and executive power as safe-
guards against tyranny and oppression. Certainly it cannot
be seriously insisted that questions of this character can be
disposed of by the doctrine of *stare decisis*." Chief Justice
Bleckley, in *Ellison* v. *Railroad Co.*, 87 Ga., 691, very forcibly
says: "Minor errors, even if quite obvious, or important errors,
if their existence be fairly doubtful, may be adhered to and
repeated indefinitely, but the only treatment for a great and
glaring error affecting the correct administration of justice in
all courts of original jurisdiction, is to correct it. When an

error of this magnitude, and which moves in so wide an orbit, competes with truth in the struggle for existence, the maxim for a Supreme Court—supreme in the majesty of duty as well as in the majesty of power—is not '*stare decisis,*' but '*fiat justitia ruat cælum.*'"

In the case of *Crowther* v. *Sawyer*, 2 Speer, 578, overruling *Dinkins* v. *Vaughan*, 1 McCord, 554, Judge O'Neall, in delivering the opinion of the court, said: "That case, as a precedent, until reviewed and reversed, of course, prevented any other decision than that given on the circuit. Here, however, if we think that the case was decided wrong, it presents no such obstacle; for, although the wisdom of the maxim *stare decisis* is acknowledged, and we rarely think it prudent to overrule a former decision, yet when it conflicts with other decisions, or has proceeded upon a plain mistake of the law, it is our duty to put it out of the way." In *Kottman* v. *Ayer*, 1 Strob., 577, Evans, J., said: "The effect of this is a reversal of the case of *Hillegas* v. *Hartley* (1 Hill, 106). I feel the full force of all that has been said on the rule of *stare decisis*, but the case of *Hillegas* v. *Hartley* has not settled any great principle of property under which rights have been acquired, which the reversal would defeat." In *Fulmer* v. *Harmon*, 3 Strob., 580, Richardson, J., said: "I here take the occasion to remark that I was myself the presiding judge in the case of *Slider* v. *Myers*, and it so happens that I am now to review my decision in that case; and I propose to show that it was erroneous and ought to have been overruled, as we now overrule the present Circuit decision, for the following reasons." In *Ex parte White*, 33 S. C., 450, Mr. Justice McIver, in overruling *Twitty* v. *Houser*, 7 S. C., 153, says: "While, therefore, Judge Wallace, not having the power to overrule that case, may have been justified in following it, yet, when the question reaches a tribunal which is invested with such power, it seems to us that such power should be exercised, when the former decision is not only clearly erroneous, but likely to lead to evil results; especially where such decision establishes no rule of property, and is not otherwise entitled to be adhered to under the wholesome doctrine of *stare decisis.*"

There are some reasons, it might be contended, why the doctrine of *stare decisis* does not apply to this case. For instance, the Dispensary Act of 1892 did not, in its title, expressly purport to be a police measure, while such is the title of the act of 1893. Again, in the act of 1893, the revenue feature is dependent upon rules to be adopted by the State board of control, while in the act of 1892 express provision was made in the act itself as to the revenue. We, however, are of the opinion that the principles upon which the act of 1892 was declared to be unconstitutional will make the act of 1893 unconstitutional, if followed in this case. In the light of the foregoing cases, the doctrine of *stare decisis* cannot be applied in this case.

The principles upon which the former decision was rendered will now be reviewed by this court, and, if found to be sound, will be followed; while, on the other hand, if found to be erroneous, will be overruled. The circumstances under which a legislative enactment should be declared unconstitutional are well expressed by Chancellor Waites, who, in delivering the opinion of the court in the case of *Byrne's Admrs: v. Stewart's Admrs.*, 3 DeSaus., 476, says: "If legislative authority is supreme in all cases in which it is not restrained by the Constitution, and as it is the duty of the legislators as well as of the judges to consult this, and conform their acts to it, so it ought to be presumed that all their acts are conformably to it, unless the contrary is manifest. This confidence in the wisdom and integrity of the legislature is necessary to insure a due obedience to its authority; for, if this is frequently questioned, it must tend to diminish that reverence for the laws which is essential to the public safety and happiness. I am not, therefore, disposed to examine with scrupulous exactness the validity of a law. It would be unwise to do so on another account. The interference of the judicial power with legislative acts, if frequent, or on dubious grounds, might occasion so great a jealousy of this power, and so general a prejudice against it, as to lead to measures which might end in the total overthrow of the independence of the judiciary, and with it this best preservative of the Constitution. The validity of a law ought not, then, to be questioned, unless it is so obviously repugnant to the Constitu-

tion that when pointed out by the judges, all men of sense and reflection in the community may perceive the repugnancy. By such a cautious exercise of this judicial check no jealousy of it will be excited, the public confidence in it may be promoted, and its just and salutary effects be justly and fully appreciated."

Mr. Justice McGowan, in *Ex parte Lynch*, 16 S. C., 34, says: "It is a delicate thing to declare an act of the legislature unconstitutional. This section of the Constitution must be construed, if possible, as allowing full force and effect to section 1, article 2, vesting the full legislative power of the State in the General Assembly. Implied limitations of legislative power are only admissible where the implication is necessary, or where language conveying a particular intent cannot have its proper force without such implication. The General Assembly has the general power of legislation upon all subjects not prohibited by the Constitution. 'The legislative department is entrusted with the general authority to make laws at discretion, and is only limited by express constitutional provisions.' Cooley Const. Lim., 87–172. 'The constitutionality of a law must be presumed until the violation of the Constitution is proved beyond all reasonable doubt, and a reasonable doubt must be solved in favor of legislative action, and the act be sustained.' *Id.*, 182." Shaw, C. J., in speaking for the court in *Ex parte Wellington*, 16 Pick., 95, says: "When courts are called upon to pronounce the invalidity of an act of legislation passed with all the forms and ceremonies requisite to give it force of law, they will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light on the subject, and never declare a statute void unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt."

In the light of these cases, we proceed to a consideration of the act of 1893. Before proceeding to a consideration of the specific objections urged against the constitutionality of the act, we desire to state at the outset that, in our opinion, the following propositions embody the principles governing this case: (1) That liquor, in its nature, is dan-

gerous to the morals, good order, health, and safety of the
people, and is not to be placed on the same footing with the
ordinary commodities of life, such as corn, wheat, cotton, to-
bacco, potatoes, etc.   (2) That the State, under its police power,
can itself assume entire control and management of those
subjects, such as liquor, that are dangerous to the peace,
good order, health, morals, and welfare of the people,
even when trade is one of the incidents of such entire control
and management on the part of the State.   (3) That the act of
1893 is a police measure.   We are frank to say that if we
are wrong as to either of these propositions, the act should
be declared unconstitutional.   We will now cite author-
ities to sustain these propositions.

We think differences of opinion as to the constitutionality
of this act arise from the attempt on the part of some to apply
to it the law applicable to the ordinary commodities of
life.   The sale of an article may be lawful unless re-
strained by law, and yet it may be of such a nature as to
endanger the peace, safety, health, and morals of a people.   We
do not suppose there is a more potent factor in keeping up the
necessity for asylums, penitentiaries, and jails, and in producing
pauperism and immorality throughout the entire country, than
liquor, and yet it is argued that it is to be placed on the same
footing with the breadstuffs and other ordinary commodities of
life.   Black Intox. Liq., § 31, says: "For an unregulated and
unrestricted traffic in liquor, it is admitted, threatens the public
safety by generating vice and crime, imperils the peace and
order of the community by the demoralization of its victims,
and poisons the fountains of the public prosperity by its con-
tributions of pauperism and squalor."   The same author, in
section 35, says "Restraints upon the traffic in spirituous li-
quors are not like such as restrict the ordinary avocations of
life which advance human happiness, or trade and commerce,
that produce neither immorality, suffering, or want."   Parker
and Worthington on Public Health and Safety shows that the
business of selling liquor is attended with danger to the com-
munity, and that a citizen has not the inherent right to follow
such avocation.

We quote the following from *State* v. *Turner*, 18 S. C., 106, in which Mr. Justice McIver delivered the opinion of the court: "The power of the legislature to regulate the sale of spirituous liquors has been too long and too well settled to admit of question at this late day. Experience has demonstrated that the unrestrained traffic in spirituous liquors is dangerous to the peace and welfare of society, and, therefore, it has long been settled that the law-making power may throw such restraints around that traffic, as in the judgment of that department of the government may be necessary to secure the peace and welfare of society."

The court, in *Crowley* v. *Christensen*, 137 U. S., 90, says: "It is urged that as the liquors are used as a beverage, and the injury following them, if taken in excess, is voluntarily inflicted, and is confined to the party offending, their sale should be without restriction, the contention being that what a man shall drink, equally with what he shall eat, is not properly matter for legislation. There is in this position an assumption of a fact which does not exist—that when the liquors are taken in excess, the injuries are confined to the parties offending. The injury, it is true, first falls upon him in his health, which the habit undermines; in his morals, which it weakens; and in the self-abasement which it creates. But as it leads to neglect of business, and waste of property, and general demoralization, it affects those who are immediately connected with and dependent upon him. By the general concurrence of opinion of every civilized and Christian community, there are few sources of crime and misery to society equal to the dram shop, where intoxicating liquors in small quantities, to be drunk at the time, are sold indiscriminately to all parties applying. The statistics of every State show a greater amount of crime and misery attributable to the use of ardent spirits obtained at these retail liquor saloons than to any other source.  *  *  *  The police power of the State is fully competent to regulate the business, to mitigate its evils, or to suppress it entirely. There is no inherent right in a citizen to thus sell intoxicating liquors by retail. It is not a privilege of a citizen of the State or of a citizen of the United States. As it is a business attended with

danger to the community, it may, as already said, be entirely prohibited, or be permitted under such conditions as will limit to the utmost its evils. The manner and extent of regulation rest in the discretion of the governing authorities. That authority may vest in such officers as it may deem proper the power of passing upon applications for permission to carry it on, and to issue licenses for that purpose. It is a matter of legislative will only."

It is because liquor is not regarded as one of the ordinary commodities that the act of 1892, prohibiting its sale, was, as to that matter, construed to be constitutional. We can not for a moment believe that the court would have declared an act constitutional that prohibited entirely the sale of corn, cotton, or other ordinary commodities. It is fallacious to argue, in the light of this distinction, so thoroughly sustained by the authorities, that if the government can take the exclusive control of the liquor traffic, it can do so as to any other avocations in life. In Black Intox. Liq., § 24, the police power is thus defined: "It cannot be doubted, however, that the origin of this power must be sought in the very purpose and framework of organized society. It is fundamental and essential to government. It is a necessary and inherent attribute of sovereignty. It antedates all laws, and may be described as the assumption on which constitutions rest; for the State, whether we regard it as an association of individuals or as a moral organism, must have the right of self-protection, and the power to preserve its own existence in safety and prosperity, else it could neither fulfill the law of its being nor discharge its duties to the individual. And to this end it is necessarily invested with power to enact such measures as are adapted to secure its own authority and peace, and preserve its constituent members in safety, health, and morality. Theories of the State, according as they tend to enlarge or restrict the legitimate sphere of its functions and activities, will create theories as to the proper limitations of the police power. But its existence in a measure proportionate to the rights and duties it is to guard, is implied in the recognition of the State as a factor in law and civilization. 'It is a power,' as has been well said, 'essential

to self-preservation, and exists necessarily in every organized community. It is, indeed, the law of nature, and is possessed by man in his individual capacity.' For these reasons, it appears that the nature and authority of the police power are best described by the maxim, '*Salus populi suprema lex*,' while the principle, '*Sic utere tuo ut alienum non lædas*,' furnishes in most cases a convenient rule for its application."

We find the following in *Trageser* v. *Gray*, 73 Md., 250: "We are unable to conclude that every one, citizen or alien, can acquire rights which can in any way control, impair, impede, limit, or diminish the police power of a State. Such power is original, inherent, and exclusive. It has never been surrendered to the general government, and never can be surrendered without imperilling the existence of civil society." Mr. Justice Field, in his dissenting opinion in *Slaughter House Cases*, 16 Wall., 36, although he denied the application of the doctrine of police power to the cases then before the court, says: "If it really were a police regulation, it would undoubtedly be within the power of legislation." Chief Justice Waite, in *Stone* v. *Mississippi*, 101 U. S., 814, says: "No legislature can bargain away the public health or the public morals. The people themselves cannot do it, much less their servants. The supervision of both these subjects of governmental powers is continuing in its nature, and they are to be dealt with as the special exigencies of the government may require. Government is organized with a view to their preservation, and cannot divest itself of the power to provide for them. For this purpose the largest legislative discretion is allowed, and the discretion cannot be parted with any more than the power itself."

The police power being fundamental in its nature, inherent in and so essential to government, that its very existence is dependent thereon, the exercise of such power is necessarily one of the chief functions of government, and primarily devolves upon the government itself, although it has been allowed in certain cases to delegate and "farm out" such power to corporations and individuals. The licensed saloon keeper does not sell liquor by reason of an inalienable right inherent in citizenship, but because the government has

delegated to him the exercise of such rights under its power of police. It would be an anomaly in the law to hold that the principal could delegate to an agent a greater power than the principal himself could exercise; yet that is contended in this case. The question admits of graver doubts as to the right of the government to delegate the power than to exercise it directly.

There are expressions of Mr. Justice McGowan in the case of *Town Council* v. *Pressley*, 33 S. C., 56, tending to sustain this view. That case also shows that the court cannot question the discretion exercised by the law-making body in adopting such measures as, in its judgment, seemed best under its power of police. In that case he says: "Undoubtedly, as a rule, every man may cultivate his own land in his own way, but even in that case he may use his land in such manner as to amount to 'a nuisance,' indictable at common law. That, however, does not touch the question under the ordinance passed by virtue of the powers conferred upon corporate authorities by the legislature 'for preserving the health, peace, order, and good government of the town.' The ordinance, by its declared purpose, was a police regulation for preserving the health of Summerville, a small town in the pines, about twenty miles out of Charleston, which afforded a convenient summer resort for health. Assuming, for the present, that the town council had the power to pass the ordinance, no question can be made whether 'a nuisance' had been created, nor whether the restrictions complained of were necessary to accomplish the purpose in view. It was their exclusive right to judge what was necessary and requisite to preserve the health of the town. 1 Dill. Mun. Corp., § 144, and authorities in note." Again: "The State, through the law-making body, certainly possesses the police power, which, from its very nature, has no well defined limits, but must be as extensive as the necessities which call for its exercise. Judge Dillon describes it thus: 'Every citizen holds his property subject to the proper exercise of this [police] power, either by the State legislature directly, or by public corporations to which the legislature may delegate it.' " Again: "If the legislature itself had passed the Summerville ordinance

just as it stands, it could not, as we think, be doubted that it was a constitutional exercise of the police power. It is said, however, that it was a mistake to suppose that the cultivation of the soil in certain crops was dangerous to health, and, therefore, the restriction was not a proper one. We suppose that the cultivation inhibited must have been considered as danger-ous to health in the locality of Summerville. But, be that as it may, it was a question for the law-making body. 'The judi-ciary can only arrest the execution of a statute when it conflicts with the Constitution. It cannot run a race of opinion upon points of right, reason, and expediency with the law-making power.' Cooley Const. Lim., p. 201. Assuming that the legis-lature had the power to pass the Summerville ordinance, there can be no doubt that it had the right to delegate that power to the municipal authorities of Summerville, as the governmental agent of the State within the corporate limits of the town. 'The preservation of the public health and safety is often made a matter of municipal duty, and it is competent for the legislature to delegate to municipalities the power to regulate, restrain, and even suppress particular branches of business, if deemed necessary for the public good.' See 1 Dill. Mun. Corp. (3d ed.), § 144, and *Harrison* v. *Mayor &c. of Baltimore*, 1 Gill., 264."

It will be seen from that case that the power of police is so great that under its exercise a person may be restricted as to the area of land he shall be allowed to cultivate under certain circumstances; yet it is contended that the State cannot take control and management herself of the liquor traffic. In *Mug-lar* v. *Kansas*, 123 U. S., 660, the court says: "But by whom or by what authority is it to be determined whether the manufac-ture of particular articles of drink, either for general use or for the personal use of the maker, will injuriously affect the pub-lic? Power to determine such questions so as to bind all must exist somewhere, else society will be at the mercy of the few who, regarding only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they please. Under our sys-tem, that power is lodged with the legislative branch of the government. It belongs to that department to exert what is

known as the 'police powers' of the State, and to determine primarily what measures are appropriate or needful for the protection of public morals, the public health, or the public safety. If, therefore, a State deems the absolute prohibition of the manufacture and sale within her limits of intoxicating liquors for other than medical, scientific, and manufacturing purposes, to be necessary to the peace and security of society, the courts cannot, without usurping legislative functions, over-rule the will of the people as thus expressed by their chosen representatives. They have nothing to do with the mere policy of legislation."

In the case of State v. County of Wapelo, 13 Iowa, 419, the court says: "Will it be said that the State can confer a police power which she herself does not possess? We do not believe that such is the theory or nature of the legislative department of our State government. We know that she may confer powers upon the judicial and executive departments, and authorize them to do acts which she herself could not do, for the reason that these are distinct and co-ordinate branches of the government, the functions of which cannot be performed by the General Assembly, but which, nevertheless, are to a certain extent under legislative control and regulation. When we say, therefore, that the legislature cannot bestow upon her subdivisions rights and powers reserved by the Constitution from her, we mean, of course, a police power. These subdivisions receive their corporate existence and all their corporate duties and powers from the legislature. They are intended as instruments of government in the hands of the legislature to aid it in the administration of its public regulations within certain pre-scribed localities. This being the case, it is competent for the legislature at any time to suspend these agencies and reclaim the powers which she had thus conferred, and execute them directly herself." Cooley Const. Lim., p. 119, says: "The con-stituent, when he has delegated an authority without an interest, may do the act himself which he has authorized another to do, and especially when that constituent is the legislature, and is not prohibited by the Constitution from exercising such author-ity. Indeed, the whole authority might be revoked, and the

legislature resume the burden of the business to itself, if, in its wisdom, it should determine that the common welfare required it.''

We come now to an examination of the act of 1893 as to its main features. It has been shown in the case of *Mugler* v. *Kansas*, 123 U. S:, 623, that what are known as ''police powers'' of the government are to be determined primarily by the legislative department. The intention of the legislature is to be gathered from the words of the act. The title of the act is, ''An act to declare the law in reference to and further regulate the use, sale, consumption, transportation, and disposition of alcoholic liquids or liquors within the State of South Carolina, and to police the same.'' The act provides that ''all such liquors, except when bought from a State officer authorized to sell the same or in possession of one, are declared to be contraband, and against the morals, good health, and safety of the State, and may be seized wherever found,'' etc. The governor, attorney general, and comptroller general shall *ex officio* constitute a State board of control to carry out the provisions of this act. The act provides for the appointment of a commissioner, who shall purchase all liquors for lawful sale under such rules and regulations as may be made by the State board of control, and furnish the same to such persons as may be designated as dispensers thereof. All liquors shall be tested by the chemist, and declared to be pure, before sale to the county dispensers. The State board of control shall appoint a county board of control, composed of three persons, who shall appoint certain officers known as ''county dispensers.'' The dispensers can only sell by the package, which cannot be broken nor the liquor drunk on the premises where sold.

The act shows that the legislature had in view the protection of the ''morals, good health, and safety of the State'' in dealing with this question. Many safeguards are thrown around the sale of the liquor. The commissioner is to be an abstainer from intoxicants. The liquor is to be tested by the chemist and declared to be pure. The liquor is to be sold only by the package, which cannot be opened nor drunk where sold. The sales can only be made in daytime. Persons cannot be appointed on the

county board of control who are addicted to the use of intoxicating liquors. No person can be appointed a county dispenser who has ever been adjudged guilty of violating the law relating to intoxicating liquors, nor who is keeper of a restaurant or a place of public amusement, nor who is addicted to the use of intoxicating liquors as a beverage. The county dispenser shall execute a bond in the sum of $3,000, upon which suit for damages may be brought for a violation of the provisions of the act by a wife, child, parent, guardian, employer, or other person. A majority of the voters in a township may prevent the establishment of a dispensary. The county dispenser shall take an oath therein prescribed. A printed or written request must be presented for permission to purchase. The sale shall not be made to a minor, a person intoxicated, a person in the habit of drinking to excess, nor to a person unless known to the dispenser. It prevents the establishment of club rooms where liquors are used. One of the beneficial results of the law is brought about by selling only for cash.

It has been argued that there was no necessity for this regulation by the State; that the same results could be accomplished by allowing private individuals to carry on the traffic, and for this reason the act is null and void. The necessity was a question exclusively for the legislative department, as shown by the foregoing authorities, particularly *Town Council* v. *Pressley*, 33 S. C., 56. The judiciary "cannot run a race of opinions upon points of right, reason, and expediency with the law-making powers." The State has the right, through its own officers—in fact, it is its primary duty—to enforce its police regulations, which right inheres in government itself, and is paramount to any right inherent in citizenship. But, referring to the foregoing objection, as matter of fact, it would not be as efficiently enforced by private individuals, because there would be the constant temptation to make as large profits as possible. Chief Justice McIver, in *McCullough* v. *Brown* (p. 241), says: "By its profit feature it holds out an inducement to every taxpayer to encourage as large sales as possible, and thereby lessen the burden of taxation to the extent of the profits realized." Now, if the indirect profits in the case mentioned are sufficient

to induce the taxpayer to encourage large sales in which he would at most have only a very small interest, how great would then be the inducement to encourage large sales when the seller would get all the profits? The Dispensary Act itself is an outgrowth of a dissatisfaction on the part of the people with the manner in which the police power, when delegated, was abused. The law was enacted in self-defence, and vindicates the wisdom of our forefathers in allowing wide legislative discretion in the exercise of the police power.

There is nothing in the act showing that its primary object is the raising of revenue. The sales are to be made under rules adopted by the county board of control, and approved by the State board of control. It is certainly possible for the objects of the act to be carried into effect under proper rules adopted for that purpose. It is within the power of the boards of control to eliminate the profit feature altogether. It is presumed that public officials will discharge the duties of office in a lawful manner, until the contrary appears. When a case is brought before this court contesting the legality of the rules adopted by the boards of control, it will be time enough then for this court to pass upon the revenue feature. Suffice it to say, no such question is now before us.

Objection has been urged against the act that it is repugnant to the provisions of the Constitution as to taxation. This objection could only be sustained in case it should be decided that the object of the act is not the exercise of police power. Police is a public purpose, and taxes levied to enable the government to enforce a law construed to be in pursuance of the police power have never been declared unconstitutional. Those interposing the objection above mentioned assume that the act is not a police measure, and thus argue against its constitutionality. If the act is a police measure, a tax levied for its enforcement would be as lawful as a tax to raise funds to build a state house or railroad, which it has been determined beyond controversy the State always does under this power of police inherent in the government. Before this objection can properly arise, it will have to be determined whether the act is a police measure, which is always a public purpose.

Objection is made as to the constitutionality of the act on the ground that it creates a monopoly. Those interposing this objection likewise assume that it is not a police measure. The objection is fully met by the decision of the court in the *Slaughter House Cases, supra,* in which the court says: "That wherever the legislature has the right to accomplish a certain result, and that result is best attained by means of a corporation, it has the right to create such a corporation, and to endow it with the power necessary to effect the desired lawful purpose, seems hardly to admit of debate." Tied. Lim., 318, says: "If it is lawful for the State to prohibit a particular business altogether, or to make a government monopoly of it, the pursuit of such business would, if permitted to any one, be a privilege or franchise, and, being like any other franchise, may be made exclusive. This is but a logical consequence of the admission that the State has the power to prohibit the trade altogether. Such an admission is fatal to a resistance of the power to make it a monopoly." The doctrine of "monopoly" cannot be applied to a State in exercising its governmental functions.

The first objection set forth in respondent's return to the writ of prohibition is that the act is in violation of sec. 1, art. I., of the Constitution of this State. That section is as follows: "All men are born free and equal, endowed by their Creator with certain inalienable rights, among which are the rights of enjoying and defending their lives and liberties, of acquiring, possessing, and protecting property, and of seeking and obtaining their safety and happiness." The act is not in violation of this section unless it has deprived the respondent of an inalienable right. It will be observed that the respondent is a municipal corporation; but, waiving all question as to the right of such corporation to claim the same "inalienable rights" as a citizen, we do not see that any "inalienable right" has been invaded. The case of *Crowley* v. *Christensen,* 137 U. S., 86, and the other authorities hereinbefore cited, clearly show that a citizen has not an "inalienable right" to sell liquor, but, on the contrary, that laws are constitutional that prohibit the sale altogether.

The second objection is that the act is in violation of sec. 2,

art. I., of the Constitution of South Carolina. That section is as follows: "Slavery shall never exist in this State; neither shall involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted." Counsel for respondent did not argue this objection, and, as it has no bearing whatever on this case, we are constrained to think there must have been a mistake in its insertion.

[The next objection interposed by respondent is that the act is in violation of section 41, art. I., of the Constitution of this State. That section is as follows: "The enumeration of rights in this Constitution shall not be construed to impair or deny others retained by the people, and all powers not herein delegated remain with the people."] This section was construed in the case of *State* v. *Hayne*, 4 S. C., 420, in such a way as to be in accord with the established theory of the State government and of the power of the legislature. Chief Justice Willard, in delivering the opinion of the court, said: "Section 1, art. II., declares that the legislative power of this State shall be vested in two distinct branches, the one to be styled 'the Senate,' and the other 'the House of Representatives,' and both together 'the General Assembly of the State of South Carolina.' Although the particular office of this section is to fix certain important features of the body through which the function of legislation is to be exercised, yet it describes in an authoritative way the nature of the power vested. It is no less than the legislative power of the State. It is not such and so much of the legislative power of the State as was intended to be used by that particular body, but it was the whole legislative power of this State, its whole capacity of making laws and providing the means for their enforcement. It was not intended that the legislature should exercise this power without limitation and restraint, for the Constitution that uses these words of grant imposes many such restrictions and limitations affecting the extent to which it may be effectively exercised. The form of expression here employed shows that the people of South Carolina entertain the same view of the nature of legislative power that is accepted by other similar communities, and intended that it should receive, in this respect, the construction ordi-

narily put upon grants of such powers in other similar instru-
ments; that is to say, they intended a general grant of that
branch of governmental power and faculty described as the
'legislative power of the State,' though subject to many restric-
tions affecting its exercise. But it has been argued that section
41 of article I. narrows this from a grant of general capacity to
one of limited power. It is said that the powers of the legis-
lature of South Carolina must be held to be special and enumer-
ated powers, like those of the Congress of the United States,
and that such as are not in terms granted must be regarded as
withheld and retained by the people, and that such is the force
and effect of section 41, article I." After quoting the section,
he proceeds: "The true effect of this declaration is, that it re-
serves to the people whatever is not granted by the instrument;
as, for instance, the right to make changes in the form of gov-
ernment is not granted, and under this clause remains with the
people, capable of exercise when they may see fit so to do. As
the legislative power is granted in express terms, importing a
grant of general powers, such general power of legislation can-
not be regarded as reserved to the people under this section.
Such general language as that contained in sec. 41, art. I., can-
not be allowed such force and effect as to change entirely the
nature of legislative power, and to introduce anomalous ideas
in the structure of the government."

The court does use the following language in *Feldman* v. *City
Council*, 23 S. C., 63, which is relied on to sustain the theory of
implied limitations upon the legislative power: "When, in ad-
dition to this, we find that the Constitution of 1868, in art. I.,
sec. 41, expressly declares that 'the enumeration of rights in
this Constitution shall not be construed to impair or deny others
retained by the people, and all powers not herein delegated
remain with the people,' we think there can be no doubt that,
even in the absence of any express restrictions upon the taxing
power of the legislature, such power can only be exercised for
some public purpose, and that whenever it is attempted to be
exercised for a private purpose, it is the duty of the courts to
declare such legislation void." The very definitions of taxation,
making it clear that it must be for a public purpose, showed

that there was no necessity for resort to the doctrine of reserved limitations to declare null and void a tax for a private purpose, and that the court would have been compelled to render the decision it did in that case, even if sec. 41, art. I., had not been referred to at all. A reference to sec. 41, art. I., was incidental only, and cannot be regarded as authority to show that there are reserved limitations, when there was nothing in that case calling for an adjudication of such question.

The cases cited in support of the doctrine of implied limitations upon the legislative authority were in regard to taxation, as to which it was not necessary to resort to such doctrine, for the simple reason, that the very definition of taxation shows it must be for a public purpose, and, therefore, an act of the legislature attempting to raise money for a private purpose is null and void. Mr. Tiedeman, in his Limitations of Police Power (page 468), says: "A tax is, in the most comprehensive sense, any charge or assessment levied by the government for public purposes upon the persons, property, and privileges of the people within the taxing district or State." Black, C. J., in *Sharpless* v. *Mayor*, 21 Pa. St., 160, which is one of the leading cases against the doctrine of reserved constitutional limitations, shows that taxation necessarily means the raising of revenue for a public purpose. In that case he says: "The legislature has no constitutional right * * * to lay a tax, or to authorize municipal corporations to do it, in order to raise funds for a mere private purpose. No such authority passed to the assembly by the general grant of the legislative power. This would not be legislation. Taxation is a mode of raising revenue for public purposes. When it is prostituted to objects in no way connected with the public interests or welfare, it ceases to be taxation, and becomes plunder."

The case of *Allen* v. *Jay*, 60 Me., 124, 11 Am. Rep., 185, quoted with approval in the case of *Feldman* v. *City Council*, *supra*, defines taxation as follows: "A tax is a sum of money assessed under the authority of the State on the persons or property of an individual. Taxation, by the very meaning of the term, implies the raising of money for public uses, and excludes the raising if for private objects or purposes." The case of

*Lowell* v. *City of Boston*, 111 Mass., 454, 15 Am. Rep., 45, also cited with approval in *Feldman* v. *City Council*, uses this language: "The power to levy taxes is founded on the right, duty, and responsibility to maintain and administer all the governmental functions of the State, and to provide for the public welfare. To justify any exercise of the power requires that the expenditure which it is intended to meet shall be for some public service, or some object which concerns the public welfare." It will thus be seen that the doctrine of implied limitations upon legislative action is not involved where simply the matter of taxation is before the court, which necessarily must be for a public purpose. For a fuller statement of the law and authorities against this dangerous doctrine of implied limitations, see the dissenting opinion of Mr. Justice Pope in *McCullough* v. *Brown.*

. To hold that there are reserved limitations of this nature is to make the Constitution give place to the will of the court upon legislative matters. Different judges might differ as to what was of common right, or against the spirit of civil liberty, and the law would thus be left in uncertainty. The unreasonableness of such construction is shown by the following illustration: It was formerly contended that "equity was not bound by rules or precedents, but acted from the opinion of the judge, founded on the circumstances of every particular case." In a note to Bl. Comm. bk. 3, p, 432, note y, the annotator, commenting on the doctrine just stated, says: "This is stated by Mr. Selden (Table Talk, tit. 'Equity,') with more pleasantry than truth: 'For law we have a measure, and know what to trust to; equity is according to the conscience of him that is chancellor; and as that is larger or narrower, so is equity. 'Tis all one, as if they should make the standard for the measure the chancellor's foot. What an uncertain measure would this be! One chancellor has a long foot, another a short foot, a third an indifferent foot. It is the same thing with the chancellor's conscience.' "

It is contended that the foregoing section prevents the legislature from embarking the State in a commercial enterprise. We have no doubt that if such was the object of the act,

and it was not intended as a police measure, it would be unconstitutional, even in the absence of sec. 41, art. I. As we have said, if the act is not a police measure, it is unconstitutional. It is quite a different thing, however, when trade is simply an incident to a police regulation. Buying and selling on the part of the federal, State, and municipal governments take place every day, and as long as the buying and selling are in pursuance of police regulations, they are entirely free from legal objection. The federal government sells liquor and other articles that have been seized as contraband. Articles are purchased by the State to keep up the penitentiary and asylum and other public institutions and enterprises. We see it buying a farm to utilize the convict labor of the State, and selling the produce made on the farm. Municipal governments have the right to buy and dispose of property in administering their governmental affairs. The very distinction for which we contend is pointed out in the case of *Mauldin* v. *City Council*, 33 S. C., 1. In that case the court showed it was not wrong for the city to buy and sell for a public purpose, but that the act only became illegal when it was for a private purpose. We think the case was properly decided, and that the decision rested upon this distinction.

The case of *Beebe* v. *State*, 6 Ind., 501, was upon the construction of a statute of Indiana somewhat similar to the act in question, and is relied upon as an authority to sustain the proposition that the State cannot take direct control and management of the liquor traffic. In that case the court uses the following language: "The business [the manufacture and sale of liquor] was, at and before the organization of the government, and is properly at all times, a private pursuit of the people, as much so as the manufacture and sale of *brooms, tobacco, clothes*, and the dealing in *tea, coffee*, and *rice*, and the raising of *potatoes*" (italics ours). This case is in conflict with the distinction made between liquor and the ordinary commodities of life, as enunciated in the case of *Crowley* v. *Christensen, supra;* Black Intox. Liq., *supra; State* v. *Turner*, 18 S.C., 106; and other authorities hereinbefore mentioned. If liquor is to be placed on the same footing with the articles mentioned

in the Indiana case, then that decision was right; but if there is that distinction for which we contend, then the case is value-less as an authority, being decided on erroneous principles. The principles upon which that case was decided would have forced the court that rendered it to have declared null and void a statute entirely prohibiting the traffic in liquor, although there is no longer any doubt as to the constitutionality of such statutes.

The case of *Rippe* v. *Becker* (Minn.), 57 N. W., 331, is also relied upon to sustain the constitutional objection to the act of 1893. The title of the act construed in *Rippe* v. *Becker* was, "An act to provide for the purchase of a site, and for the erection of a State elevator or warehouse at Duluth for public storage of grain." The syllabus of the case prepared by the court states: "The police power of the State to regulate a business is to be exercised by the adoption of rules and regulations as to the manner in which it shall be conducted by others, and not by itself engaging in it." The language of the court, as applying to that case, was proper, and we think the case was properly decided in the light of the distinction between liquor and the ordinary commodities of life which we have pointed out. There was nothing in the business dangerous to the health, morals, and safety of the people, and the act should have been declared null and void.

Respondent's next objections are that the act is in violation of the 4th, 5th, and 14th amendments to the Constitution of the United States. Those amendments have no application to this case. In *Smith* v. *Maryland*, 18 How., 71, the court says: "If rested on that clause in the Constitution of the United States which prohibits the issuing of a warrant but on probable cause supported by oath, the answer is that this restrains the issue of warrants only under the laws of the United States, and has no application to State process. *Barron* v. *Mayor*, 7 Pet., 243; *Livingston's Lessee* v. *Moore, Id.*, 469; *Fox* v. *Ohio*, 5 How., 410." Chief Justice Fuller, delivering the opinion of the court in *Wilkerson* v. *Rahrer*, 140 U. S., 545, says: "The power of the State to impose restraints and burdens upon persons and property in conservation and

promotion of the public health, good order, and prosperity, is a power originally and always belonging to the States, not surrendered by them to the general government, nor directly restrained by the Constitution of the United States, and essentially exclusive. And this court has uniformly recognized State legislation legitimately for police purposes as not, in the sense of the Constitution, necessarily infringing upon any right which has been confided expressly or by implication to the national government. The fourteenth amendment, in forbidding a State to make or enforce any law abridging the privileges or immunities of citizens of the United States, or to deprive any person of life, liberty, or property without due process of law, or to deny to any person within its jurisdiction the equal protection of the laws, did not invest, and did not attempt to invest, Congress with power to legislate upon subjects which are within the domain of State legislation. * * * In short, it is not to be doubted that the power to make the ordinary regulations of police remains with the individual States, and cannot be assumed by the national government, and that in this respect it is not interfered with by the fourteenth amendment. *Barbier* v. *Connolly*, 113 U. S., 27.'' Mr. Justice Harlan, delivering the opinion of the court in *Mugler* v. *Kansas*, 123 U. S., 623, sustains this view, and quotes with approval the following from the case of *Barbier* v. *Connolly*, 113 U. S., 31: ''But neither the amendment [fourteenth], broad and comprehensive as it is, nor any other amendment, was designed to interfere with the power of the State, sometimes termed its 'police power,' to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity.''

The next objection to the constitutionality of the act interposed by respondent is that it is in violation of section 8, art. I., of the Constitution of the United States, and, also, of the act of Congress regulating commerce between the States.

The provision of the Constitution referred to is that which empowers Congress to ''regulate commerce with foreign na-

tions, and among the several States, and with the Indian tribes." The act of Congress, passed in 1890, known as the "Wilson Act," which, it is claimed, the dispensary law violates, is as follows: "An act to limit the effect of the regulations of commerce between the several States and with foreign countries in certain cases. That all fermented, distilled, or other intoxicating liquors or liquids, transported into any State or territory, or remaining therein for use, consumption, sale or storage therein, shall, upon arrival in such State or territory, be subject to the operation and effect of the laws of such State or territory, enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise." 26 Stat. U. S., 313.

On the one side it is contended that "arrival" means "destination," or "the place to which the liquors are consigned;" on the other side it is urged that "arrival in the State" means "when the territorial limits of the State have been entered." The act does not speak of the arrival of the liquors at their destination or the place to which they are consigned, but of their "arrival in the State," which would seem to indicate the time when the liquors cross the borders and enter the territorial limits of the State. We are, however, unwilling to rest our construction on so important a question upon a mere quibble as to the meaning of a word which is susceptible of being used in more than one sense, but to construe the act in the light of the circumstances that led to its adoption. The subjects affected by the laws of interstate commerce are divided into two classes: first, those that are local in their nature; and, second, those national in character. This distinction is announced in the case of *County of Mobile* v. *Kimball*, 102 U. S., 697, in which Mr. Justice Field, delivering the opinion of the court, says: "The subjects, indeed, upon which Congress can act under this power are of infinite variety, requiring for their successful management different plans or modes of treatment. Some of them are national in their character, and admit and require uniformity of

regulation affecting alike all the States; others are local, or are mere aids to commerce, and can only be properly regulated by provisions adapted to their special circumstances and localities. Of the former class may be mentioned all that portion of commerce with foreign countries, or between the States, which consists in the transportation, purchase, sale, and exchange of commodities. Here there can, of necessity, be only one system or plan of regulations, and that Congress alone can prescribe. Its non-action in such cases with respect to any particular commodity or mode of transportation is a declaration of its purpose that the commerce in that commodity or by that means of transportation shall be free. There would otherwise be no security against conflicting regulations of different States, each discriminating in favor of its own products and citizens, and against the products and citizens of other States. And it is a matter of public history that the object of vesting in Congress the power to regulate commerce with foreign nations and among the States was to insure uniformity of regulation against conflicting and discriminating State legislation. Of the class of subjects local in their nature, or intended as mere aids to commerce, which are best provided for by special regulations, may be mentioned harbor pilotage, buoys, and beacons to guide mariners to the proper channel in which to direct their vessels. The rules to govern harbor pilotage must depend in a great degree upon the peculiarities of the ports where they are to be enforced. It has been found by experience that skill and efficiency on the part of local pilots is best secured by leaving this subject principally to the control of the States. Their authority to act upon the matter and regulate the whole subject in the absence of legislation by Congress, has been recognized by this court in repeated instances.''

Under the decision of the Supreme Court of the United States, liquor was held to be a subject of commerce, and national in its character. It was settled at an early date in the history of the national government, that the State, under its police power, could legislate upon those subjects of local nature until Congress saw fit to interfere and supersede the State law. It was, however, a vexed question for a long time in the courts

of the United States as to the right of the State, under its
police power, to subject to its laws those subjects of interstate
commerce which were national in character, in the absence of
congressional legislation upon the subject.    In the case of *Leisy*
v. *Hardin*, 135 U. S., 131, the court had under consideration
the act of Iowa, which forbade any common carrier to bring
within the State of Iowa, for any person or persons, or corpo-
ration, any intoxicating liquors from any other State or terri-
tory of the United States, without first having been furnished
with a certificate under the seal of the County Auditor of the
county to which said liquor was to be transported or was con-
signed for transportation, certifying that the consignee or per-
son to whom such liquor was to be transported, conveyed, or
delivered, was authorized to sell intoxicating liquors in such
county.    By a divided court, it was held that such act was un-
constitutional; that the police power of a State is subordinate
to the commercial power, and, consequently, that a State could
not prescribe conditions upon which liquors could be trans-
ported into such State from another State; and, also, that
liquors transported into a State from another State could be
sold in the original packages, even when the laws of the State
into which such liquor was transported prohibited the sale.

The decision in this case caused the passage of the act of
Congress of 1890, and the reasons leading to its adoption are
well expressed in the dissenting opinion of Mr. Justice Gray
(concurred in by Mr. Justice Harlan and Mr. Justice Brewer)
in that case, in the following words: "How far the protection
of the public order, health, and morals demands restriction or
prohibition of the sale of intoxicating liquors, is a question pe-
culiarly appertaining to the legislatures of the several States,
and to be determined by them upon their own views of public
policy, taking into consideration the needs, the education, the
habits, and the usages of people of various races and origin,
and living in regions far apart, and widely differing in climate
and in physical characteristics.    The local option laws pre-
vailing in many of the States indicate the judgment of as many
legislatures that the sale of intoxicating liquors does not admit
of regulation by a uniform rule over so large an area as a sin-

gle State, much less over the area of a continent. It is manifest that the regulation of the sale, as of the manufacture of such liquors manufactured in one State to be sold in another, is a subject which, far from requiring, hardly admits of, a uniform system or plan throughout the United States. It is, in its very nature, not national, but local, and must, in order to be either reasonable or effective, conform to the local policy and legislation concerning the sale or the manufacture of intoxicating liquors generally. Congress cannot regulate this subject under the police power, because that power has not been conceded to Congress, but remains in the several States; nor under the commercial power, without either prescribing a general rule unsuited to the nature and requirements of the subject, or else departing from that uniformity of regulation which, as declared by this court in *Kidd* v. *Pearson*, above cited, it was the object of the commercial clause of the Constitution to secure. But an intention is not likely to be again imputed to the framers of the Constitution, or to the Congress of the United States, *to subordinate the protection of the safety, health, and morals of the people to the promotion of trade and commerce"* (italics ours.) Again: "The statutes in question were enacted by the State of Iowa in the exercise of its undoubted power to protect its inhabitants against the evils, physical, moral, and social, attending the free use of intoxicating liquors. They are not aimed at interstate commerce; they have no relation to the movement of goods from one State to another, but operate only on intoxicating liquors within the territorial limits of the State. They include all such liquors without discrimination, and do not even mention where they are made or whence they came. They affect commerce much more remotely and indirectly than laws of a State (the validity of which is unquestioned) authorizing the erection of bridges and dams across navigable waters within the limits, which wholly obstruct the course of commerce and navigation, or than quarantine laws, which operate directly upon all ships and merchandise coming into the ports of the State."

The intention of Congress was to deprive liquor of its national character as a subject of commerce, make it local in its

nature, and subject to the police power of the State, until Congress sees fit to legislate upon it. It was the intention of Congress to subordinate the commercial power of the national government to the police power of the State on the subject of liquor. Such being the reasons that actuated Congress in passing the act of 1890, we cannot think, in the absence of a plain expression, that Congress intended to subordinate only a part of its commercial power to the police power of the State on this subject, but, on the contrary, that the sale, as well as the conditions, upon which the liquor should be transported after it was introduced into the territorial limits of the State, should be left to State legislation. To give a different construction to the act would subject liquor to two powers—the commercial and police—within the territorial limits of the State. We cannot think this was the intention of Congress when it deprived it of its national character.

The first exception of respondent was, on motion of respondent's attorney, withdrawn by a formal order of this court, and will not, therefore, be considered. The principles herein announced render it unnecessary to consider the other exceptions.

The conclusions herein announced are in conflict with the case of *McCullough* v. *Brown*, 41 S. C., 220, *supra*. That case, therefore, and those decided upon its authority, are overruled, in so far as they are antagonistic to the principles upon which this case is decided.

It is the judgment of this court, that the judgment of the Circuit Court be affirmed, for the reasons herein set forth.

MR. JUSTICE POPE. I concur, and will hereafter file a separate opinion.

MR. CHIEF JUSTICE McIVER, dissenting. As I cannot concur in the conclusions reached by the majority of this court in this case, I propose to state as briefly as practicable the grounds of my dissent. Inasmuch as it is distinctly admitted in the opinion prepared by Mr. Justice Gary, now under review, that while there are certain minor differences between the two acts of 1892 and 1893, relating mostly to the administrative features of the law, yet "that the principles upon which the act of 1892

was declared to be unconstitutional will make the act of 1893 unconstitutional, if followed in this case;" and inasmuch as the same admission is made in express terms by one of the counsel who argued this cause on the part of the State, and by the other, impliedly, at least, there is no necessity to enter into any consideration of the terms of the two acts, respectively, in order to show that they both rest upon the same principles, and, if the one is unconstitutional, the other must be so also. The practical question, therefore, which is now presented, is whether the cases of *McCullough* v. *Brown,* 41 S. C., 220, and the cases of *Barringer* v. *City Council, Ex parte Brunson, Id.,* 501, and *State* v. *O'Donnell, Id.,* 553, recognizing and following the case of *McCullough* v. *Brown,* shall now be overruled, and also whether the principles declared in *Feldman* v. *City Council,* 23 S. C., 57, and *Mauldin* v. *City Council,* 33 S. C., 1, relied upon to support the decision in *McCullough* v. *Brown,* shall now be disregarded. .

A sufficient answer to this question is, in my judgment, the well settled and wholesome doctrine of *stare decisis;* for while no one, so far as I am informed (I certainly do not), doubts the power of this court to overrule a former decision, yet the wisdom or propriety of exercising such a power, presents a very different question.  Text-writers, as well as courts of the highest authority, warn us against the exercise of this admitted power, even where the court may regard a former decision as erroneous in some respects.  See Kent's twenty-first lecture, which will not be quoted from here, as it is largely quoted from in a decision of this court which will presently be cited.  In *Wright* v. *Sill,* 2 Black, 544, the Supreme Court of the United States uses this language: "Whatever differences of opinion may have existed in this court originally in regard to these questions, or might now exist, if they were open for reconsideration, it is sufficient to say that they are concluded by these adjudications."  In *Minnesota Co.* v. *National Co.,* 3 Wall, 332, the same tribunal, in speaking of the importance of adhering to former decisions, used this language: "Parties should not be encouraged to speculate on a change of the law when the administrators of it is [are] changed."

In the case of *Gage* v. *Charleston*, 3 S. C., 491, the Supreme Court of this State, when called upon to reverse a decision of their predecessors, in the case of *State* v. *Mayor, etc., of Charleston*, 10 Rich., 491, declined to do so, resting their decision solely on the doctrine of *stare decisis*. Moses, C. J., in delivering the opinion of the court, rests his conclusion largely upon the authority of Chancellor Kent, who "bears his own testimony to the importance of adhering to a solemn decision, as the highest evidence which we can have of the law applicable to the subject," and recommends and adopts the rule laid down by that eminent jurist as the rule by which this court must be governed. There can be no doubt that in the case of *McCullough* v. *Brown, supra*, this court, as it was then constituted, made "a solemn decision" of the identical question now presented, and there is as little doubt that such decision was recognized and affirmed in the three subsequent cases above cited. Here, then, we have a solemn decision, made, too, as is well known, after the most elaborate argument, and after the fullest consideration by the court, affirmed in three subsequent cases, which, as Chancellor Kent says, furnishes "the highest evidence which we can have of the law applicable to the subject;" and if all this does not furnish a proper case for the application of the wholesome doctrine of *stare decisis*, it is difficult for me to conceive of a case for its application.

But I do not propose to rest my dissent solely upon the doctrine of *stare decisis*, but will proceed to consider whether the principles upon which the decision in *McCullough* v. *Brown* rests have been shown to be erroneous; for, until that is done, every one must admit, as Mr. Justice Gary frankly does admit, that such decision must be followed in this case. I do not, of course, propose to reproduce here the reasoning employed or the authorities cited in the previous decision, except in so far as it may be necessary to correct what appear to me to be certain misconceptions of the grounds upon which the former decision was rested. While, therefore, still relying upon, but not repeating here, such reasoning and authorities, I proceed to notice certain points in which, as it seems to me, the former decision has been entirely misunderstood. Inasmuch as it was

distinctly declared in the former decision (p. 41), that "we fully concede the power on the part of the legislature to throw around such traffic [speaking of the liquor traffic], all safe-guards necessary and proper to prevent or, at least, minimize such evils [alluding to the evils likely to flow from an unre-stricted traffic in spirituous liquors], and while we may further admit, for the purposes of this discussion, that the legislature may go further, and absolutely prohibit the sale of intoxicating liquors within the limits of this State, yet the practical question still remains, whether the Dispensary Act falls within either of these classes"—that is to say, whether such act can properly be regarded either as a prohibition law or as a law to regulate the sale of spirituous liquors, for the opinion immediately proceeds to show that the Dispensary Act cannot properly be regarded as either the one or the other; and again, after discussing the question whether the Dispensary Act can properly be regarded as an act to regulate the sale of spirituous liquors, this language is found in the opinion of the majority of the court in *McCullough* v. *Brown* (p. 244): "Now, while the power of the legislature to enact such laws as may be deemed necessary and proper to regulate the sale of intoxicating liquors by any person within the limits of the State, in order to prevent or at least reduce, as far as possible, the evils which are apt to flow from such a traffic, is conceded, yet we cannot regard the dispensary law as such an act." In view of these distinct and repeated concessions, it is impossible to understand why it should have been thought necessary, or even pertinent, to cite case after case, to show that this court had previously held the law to be just what it was explicitly conceded to be in the former opinion. To say the very least, it was certainly a work of supererogation, or it disclosed a clear misconception of the positions taken in the previous case.

Another misconception of the grounds upon which the deci-sion in *McCullough* v. *Brown* was rested will be found in the unwarranted assumption that the court in that case denied the power of the legislature to embark the State in a trading enter-prise upon some vague ground that it is in violation of the fundamental theories of republican institutions, or, as it has

been expressed, "under the guise of some philosophical abstraction that there is some power in them [the courts] by reason of some mysterious something, called, for the want of a better name, 'the social compact;'" or, as it is expressed by the attorney general in his argument in this case, the court, in the case of *McCullough* v. *Brown,* acting upon the theory "that there was an unwritten constitution prohibiting the encroachments on natural rights without and beyond the terms of the written constitution, logically took into that theory, and as necessary to it, the construction that sec. 41 of art. 1 limited the powers of the written constitution—thus making a resort to some standard not laid down in the words of the charter" (the word "necessary," or some such word, being probably omitted by a mistake of the printer). A careful scrutiny of the opinion of the majority utterly fails to show that the denial of the power of the legislature to embark the State in any trading enterprise is rested upon any such vague, philosophical abstractions, or any such grounds as have been indicated above, as the basis upon which such denial rests.

In that opinion the following language is used (p. 248): "Finally, the constitutionality of the Dispensary Act is assailed upon the grounds that the legislature have undertaken thereby to embark the State in a trading enterprise, which they have no constitutional authority to do—not because there is any expressed prohibition to that effect in the Constitution, but because it is utterly at variance with the very idea of civil government, the establishment of which was the expressly declared purpose for which the people adopted their Constitution; and, therefore, all the powers conferred by that instrument upon the various departments of the governments must necessarily be regarded as limited by that declared purpose." And again, after showing that this doctrine of implied limitations upon the legislative power had been recognized and applied in cases of taxation by the Supreme Court of the United States and by this court itself, as well as by the courts of other States, we find this language (p. 249): "Upon the same principle, it seems to us clear that any act of the legislature which is designed to, or has the effect of, embarking the State in any trade which in-

volves the purchase and sale of any article of commerce for profit, is outside and altogether beyond the legislative power conferred upon the General Assembly by the Constitution, even though there may be no expressed provision in the Constitution forbidding such an exercise of legislative power. Trade is not and can not properly be regarded as one of the functions of government. On the contrary, its function is to protect the citizen in the exercise of any lawful employment, the right to which is guaranteed to the citizen by the terms of the Constitution, and certainly has never been delegated to any department of the government.''

If there is anything in this language which contains the gist of the argument upon which the proposition that the legislature had no power to embark the State in a trading enterprise, that contains any hint or suggestion even that the majority of the court rested its conclusion upon this point in the case upon any such principles as have been unwarrantably assumed to be the basis of the former decision as set out above, I must confess my inability to perceive it. On the contrary, the conclusion formerly reached was rested solely upon the ground that, although the Constitution contained no express provision prohibiting the legislature from embarking the State in a trading enterprise, yet such a prohibition was necessarily implied by the terms used in the Constitution, expressly declaring the purpose for which that instrument was adopted, as well as by the express terms used in section 41 of article 1 of the Constitution.

This brings me to notice another misconception of the view taken of that section in the former case. It seems to be supposed that the majority of the court in the case of *McCullough* v. *Brown* construed that section as meaning that a portion of the legislative power had been reserved by the people, and, therefore, the portion so reserved could not be exercised by the legislature, and the case of *State* v. *Hayne*, 4 S. C., 403, is again cited to refute such supposed view. In the former case the majority of the court used the following language (p. 249): ''It seems to us that the true construction of this clause is that, while there are many rights which are expressly reserved to the people, with which the legislature are forbidden to inter-

fere, there are other rights reserved to the people, not expressly but by necessary implication, which are beyond the reach of the legislative power, unless such power has been expressly delegated to the legislative department of the government." In view of this express statement of what the court in the former case regarded as the true construction of section 41 of article 1, it is somewhat difficult to understand how it can be supposed that the court regarded it as reserving any legislative power to the people.

Indeed, the construction placed upon this clause of the Constitution by the majority of the court in the case of *McCullough* v. *Brown,* is practically the same as that adopted by Willard, C. J., in *State* v. *Hayne, supra,* for he says: "The true effect of this declaration is that it reserves to the people whatever is not granted by the instrument, as, for instance, the right to make changes in the form of government is not granted, and under this clause remains in the hands of the people, capable of exercise when they may see fit to do so." The form of expression used, "as, for instance," shows that the right to change the form of government, used merely as an illustration, was not the only right reserved by this clause of the Constitution; and I may venture to add another illustration, as, for instance, the right to settle any disputed question of science by legislative act is not granted, and, therefore, is beyond the competency of the legislature, though not expressly forbidden, but is forbidden by necessary implication. Why? Because it is altogether outside of the declared purpose in forming the Constitution, and, therefore, beyond the purview of the legislative power therein granted. Other illustrations might be used, but, as time is pressing, I will, as Mr. Chief Justice Willard did, content myself with one. It is very obvious, therefore, why it was not deemed necessary to refer to the case of *State* v. *Hayne* in *Feldman* v. *City Council,* 23 S. C., 57.

In this connection, it may be well to notice the criticism of Mr. Justice Gary upon that case. His view, as I understand it, is that, while the decision in that case was right, it was placed upon an erroneous ground; that the very nature and definition of the term "taxation," necessarily implied that it

could only be imposed for some public purpose.   Hence, when the Constitution conferred upon the legislature the general power of taxation, the use of that term necessarily carried with it the idea that it could only be imposed for some public purpose, although the Constitution did not, in express terms, forbid the imposition of taxes for a private purpose.   This, as it seems to me, is but the expression of the same principle upon which the decision in Feldman's case rested, in a different and perhaps stronger form.   The principle upon which the question turns is, that the grant of any legislative power is necessarily limited by the nature and definition of the terms used in conferring the power.   Hence, as I have argued in this as well as in the former case, the general grant of legislative power contained in the Constitution must be regarded as necessarily limited by the expressly declared purpose for which such grant was conferred.   To apply this principle to the present case, the Constitution having been adopted for the declared purpose of forming a civil government, every grant of power therein to the different departments of the government, legislative or otherwise, must necessarily be limited to the accomplishment of that expressly declared purpose as ascertained by the nature and definition of the terms used in declaring such purpose, just as the general power of taxation, when conferred without any express limitation, is necessarily limited to the purposes for which such power is conferred, as ascertained by the nature and definition of the term used.   Indeed, I understand it to be a settled rule of construction to be applied to any written instrument, whether it be a Constitution or an ordinary contract between private persons, that where the purpose of such instrument is expressly declared therein, reference must be had to such declared purpose in ascertaining the scope and extent of its terms.   I think, therefore, that until it is shown (which I think never can be) that trade is one of the appropriate functions of civil government, any statute purporting to embark the State in any trading enterprise is altogether beyond the competency of the legislature, because it exceeds the limitations upon the legislative power necessarily implied from the express terms used in the Constitution.

This doctrine of necessary implication has been expressly recognized and affirmed by the Supreme Court of the United States in at least two cases—*Dobbins* v. *Commissioners*, 16 Pet., 435, where it was held that a State could not impose a tax upon the salary of an officer of the United States government; and the case of *Collector* v. *Day*, 11 Wall., 113, where it was held that the United States government could not impose a tax upon the salary of a State officer. In the case last cited, Mr. Justice Nelson, in delivering the opinion of the court, uses this language: "It is admitted that there is no express provision in the Constitution that prohibits the general government from taxing the means and instrumentalities of the States, nor is there any prohibiting the States from taxing the means and instrumentalities of that government. In both cases, the exemption rests upon necessary implication, and is upheld by the great law of self-preservation." As I understand it, Mr. Justice Gary, with that commendable frankness and candor which should always characterize a judicial opinion, concedes that if the object of the Dispensary Act was to embark the State in a commercial enterprise, and it was not intended as a police measure, it would be unconstitutional. It is due to him that I should quote the language used by him in this connection: "We have no doubt that if such was the object of the act, and it was not intended as a police measure, it would be unconstitutional, even in the absence of section 41, article 1. As we have said, if the act is not a police measure, it is unconstitutional. It is quite a different thing, however, when trade is simply an incident to a police regulation."

The next inquiry, therefore, is, whether this dispensary legislation can be regarded as a legitimate exercise of the police power. And first, it will be necessary to determine where such legislation is to be found. It certainly is not to be found in the act of 1893 alone, for that view is clearly negatived by the title of that act, as well as by the terms used in its repealing clause. The title of the act of 1893 is as follows: "An act to declare the law in reference to, and further regulate, the use, sale, consumption, transportation, and disposition of alcoholic liquids or liquors within the State of South Carolina, and to

police the same." Now, the use of the words, "declare the law," and "further regulate the use, sale," &c., "of alcoholic liquors," necessarily implies the continued existence of some previous law upon the subject; and the only statute of that kind which we have is the act of 1892 upon the same subject, which passed under review in the case of *McCullough* v. *Brown*. Then the repealing clause of the act of 1893, which is in these words, "All acts or parts of acts inconsistent with this act are hereby repealed," does not, in terms, purport to repeal any particular act, but only such acts or parts of acts as may be inconsistent with the act of 1893. Hence, upon the plainest principles of statutory construction, the act of 1893, even if regarded as constitutional, cannot be considered as repealing the entire act of 1892, but only such parts thereof as may be found inconsistent with the provisions of the act of 1893. It follows from this, that the dispensary legislation must be found in both acts.

The next question is, whether such legislation can properly be regarded as a legitimate exercise of the police power of the State. Without repeating here the reasoning and the authorities used in the majority opinion of this court in *McCullough* v. *Brown*, to show that this legislation cannot be regarded as a legitimate exercise of the police power, though still relying upon the same, I will proceed to consider some other views upon this subject presented in the argument of the case now before the court, and in the consideration of this case by the court. Before doing so, however, I must be permitted to advert to what I consider a very dangerous doctrine, asserted in the former case, and again insisted upon in this case. That doctrine, as I understand it, is, that the police power of the State is limited only by the will of the legislature, except, perhaps, in those cases where certain powers have been denied to the States by the provisions of the Federal Constitution. Hence, it is argued that when the legislature passes an act declaring it to be intended as a police regulation, the court have no right to inquire whether such act is, in fact, a police regulation, and, as such, a legitimate exercise of the police power. I cannot subscribe to any such doctrine, for it would subject the rights

of the citizen, secured to him by constitutional provisions, to the unrestrained will of the legislature, and would render absolutely useless all the safeguards provided in the Constitution for the protection of his rights against invasion by the law-making power of the government. While this undefined and, therefore, dangerous power, called in general terms the "police power," is fully conceded, and, I may add, is essential to the welfare of the government and of the people composing it, yet I cannot agree that it can be exercised without limitation or restraint. It has its origin and is based upon the doctrine of self-preservation, said to be the first law of nature. "*Salus populi est suprema lex.*" It may be likened to the doctrine of self-defence as between individuals, which justifies even the taking of human life in a case proper for its exercise; and, as the courts have unquestioned authority to pass upon any case in which that doctrine is invoked, I do not see why, upon the same principle, the courts may not pass upon a similar power, when it is invoked, to sustain an act of the legislature.

These views, which it seems to me are fully supported by reasoning from the nature of the case, are also sustained by authority. To show this, it is only necessary to refer to the case of *McCandless* v. *Railroad Co.*, 38 S. C., 103, and to what is said by Mr. Justice Harlan in the case of *Mugler* v. *Kansas*, 123 U. S., at pages 660, 661, a case quoted from in the opinion of Mr. Justice Gary. It seems to me that the use of the word "primarily" in the quotation is sufficient to show that the learned judge recognized the doctrine for which I contend—that while the legislature must of necessity "primarily" determine what measures are needful or appropriate for the protection of the public morals, &c., yet such determination is not final and conclusive. But if there is any doubt as to the true meaning of the sentence quoted, that doubt is effectually dissipated by the language immediately following, which is not quoted: "It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exertion of the police powers of the State. There are, of necessity, limits beyond which legislation cannot rightfully go. * * * The courts are not bound by mere forms,

nor are they to be misled by mere pretences.   They are at liberty—indeed, under a solemn duty—to look at the substance of things whenever they enter upon the inquiry, whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the court to so adjudge, and thereby give effect to the Constitution.''

I proceed next to inquire whether the dispensary legislation can be regarded as a legitimate exercise of the police power. It seems to me clear beyond dispute that it cannot.   As is said in the quotation from Black on Intoxicating Liquors, found in Mr. Justice Gary's opinion, the maxim, *"Sic utere tuo ut alienum non lœdas,"* furnishes the general rule for the application of the police power.   In other words, that power can only be exercised for the purpose of restraining one citizen from so using his own rights or property as to work injury to the rights of another.   To apply this abstract principle to the particular subject with which we are dealing, under the police power the law-making department of the government may throw such restraints around the traffic in spirituous liquors as may be deemed necessary to protect the health, morals, and safety of the community, and may even go further, and absolutely prohibit such traffic, provided it is inherently and necessarily injurious to society.   But this power is to be exerted for the purpose of restraining the citizen in the exercise of his rights to trade in any lawlul article of commerce, and cannot be so extended as to authorize the State to engage in a traffic forbidden to the citizen.   The police power reaches its limit when it restrains or prohibits a citizen from engaging in a traffic regarded as hurtful to society, and cannot be exercised for the purpose of enabling the State to engage in such traffic.

This proposition has been distinctly decided in the only case, so far as I know, in which this proposition has been directly presented.   In the case of *Rippe* v. *Becker*, 1 Minn., I find the following language in the syllabus, prepared by the

court itself for the very purpose of showing what were the points decided in the case: "The police power of the State to regulate a business is to be exercised by the adoption of rules and regulations as to the manner in which it shall be conducted by others, and not by itself engaging in it." And in the body of the opinion I find this language: "The police power of the State to regulate a business does not include the power to engage in carrying it on." And again the learned judge, speaking for the court, in regard to the true signification of the police power, says: "The term means simply the power of the State to impose those restraints upon private rights which are necessary for the general welfare of all, and is but the power to enforce the maxim, *Sic utere tuo ut alienum non lædas.*" It seems to me clear that when the police power has been exercised by enacting laws for the regulation of the traffic in spirituous liquor by the citizen, or absolutely prohibiting such traffic, the police power is exhausted, for there is nothing else upon which it can be exercised. Hence any legislation which, going beyond this, purports to invest the State authorities with the exclusive right to buy and sell spirituous liquors, cannot be vindicated as an exercise of the police power.

An attempt is made to draw a distinction between the application of the police power to the traffic in spirituous liquor and to other subjects, to which such a power may be applied. I am unable to discover any foundation for such a distinction, either in reason or authority. While it may be true that the mode of exercising the power may be different, according to the subject to which it is applied, and the regulation may be much more stringent in one case than in the other, yet the foundation of the power, and the principle upon which it is exercised, is the same, no matter what the subject may be to which it is applied. The regulations which have, from time to time, been adopted by which the traffic in spirituous liquors has been controlled, are fully justified as a legitimate exercise of the police power, because it is generally, if not universally, regarded as a traffic dangerous to society if unrestrained and unregulated by law. Upon the same principle the traffic in

drugs, which, of course, includes poisons of all kinds, being regarded as attended with danger to the community unless subjected to proper regulations, may, under the police power, be so regulated; but the legislature, under the guise of the police power, has no more right to pass an act by which the State is to assume the exclusive business of buying and selling spirituous liquors, absolutely forbidding the citizen from engaging in such business, than it has to pass an act by which the State is to assume the exclusive business of buying and selling drugs, absolutely forbidding the citizen from engaging in such business.   The same principle applies to all other subjects upon which the police power may be legitimately exercised.

It seems to me, also, an entire mistake to argue that, because the State may delegate the exercise of the police power to some subordinate governmental agency—as, for example, a municipal corporation—it may also delegate such power to a private citizen, and that it does so delegate it when it issues a license to a saloon keeper to sell spirituous liquors.  While it is not doubted that the State may and has delegated the police power to some subordinate governmental agency, such as a municipal corporation, within the limits of such corporation, I do most emphatically deny the power of the legislature to delegate any portion of its legislative power—police power or anything else—to a private citizen; and, so far as I am informed, neither this State nor any other has ever undertaken to do so.   When the legislature passes an act forbidding the sale of spirituous liquors by any private citizen without a license, and prescribes the conditions upon which such a license may be obtained, this is done by the State, through its legislative department, in the exercise of the police power of the State; and when the person to whom the license has been issued sells any spirituous liquor, he does so not by virtue of any police power delegated to him, but by virtue of his compliance with the regulations prescribed by the State in the exercise of its police power.   But, as was held in the case of *Mauldin* v. *City Council*, 33 S. C., 1, even where the State delegates the police power to a municipal corporation in the broadest and most unlimited terms, the corporation could not,

under the guise of an exercise of the police power, engage in
any private business; for, as was said by Mr. Justice McGowan
in that case: "All the powers given to the city council were for
the sole and exclusive purpose of government, and not to enter
into private business of any kind outside of the scope of the
city government." The decision in that case, as was shown in
*McCullough* v. *Brown,* rests upon a principle which, as it seems
to me, is conclusive of the question now presented.

There is another consideration which conclusively shows
that this dispensary legislation cannot be regarded as a legiti-
mate exercise of the police power. Both of the acts of 1892
and 1893 manifestly contemplate that, as a part of the scheme,
the State authorities shall sell spirituous liquors outside the
limits of this State, and upon this construction of the act of
1892, the State authorities have acted, as may be seen by ref-
erence to the case of *South Carolina* v. *Seymour,* 153 U. S., 353,
where, in the oath of the governor in support of the petition
for the registry of the trade-mark adopted by the State, it is
stated, "that the said trade-mark is used by the said State in
commerce with foreign nations or Indian tribes, and particu-
larly with Canada." This feature of this dispensary legisla-
tion, together with its profit features, commented on in the
former decision, show to my mind very clearly that the whole
scope and intent of this legislation was to enable the State to
monopolize the liquor traffic, to the entire exclusion of the
citizens, with a view to the profit of such traffic. This is made
more apparent when it is seen that the same legislature which
passed the act of 1893, passed another act on the same day,
providing that the profits of the dispensary in the county of
Clarendon should be applied to the past indebtedness of that
county. See acts 1893, p. 452.

As a justification for the State entering into the business of
buying and selling liquors, reference is made to the fact that
the federal, State, and municipal governments buy and sell
articles without question as to their authority so to do; and
reference is made to the practice of the penitentiary and luna-
tic asylum, both of which institutions buy articles for the
support thereof, and sell the products of the labor of the in-

mates thereof. But this, as it strikes me, is a very different thing from the State's engaging in the liquor traffic. In the one case, the articles are bought for the purpose of carrying on the government or the institutions above alluded to, and when no longer needed for such purposes, sold again, while under the dispensary legislation, liquor is bought, not for any governmental purpose, but for the express purpose of being sold again at a profit. It also seems to have escaped attention that the two institutions specially referred to—the lunatic asylum and penitentiary—are both contemplated and provided for in the Constitution (the former expressly, and the other by necessary implication, as may be seen by reference to sections 1, 2, article XI., of the Constitution), and, therefore, any appropriate means for carrying them on may lawfully be provided for by statute.

But, without pursuing the subject further, it seems to me that it has been shown in this and in the opinion of the majority of the court in the case of *McCullough* v. *Brown*, that spirituous liquor is a lawful article of commerce; and this is so acknowledged by the Supreme Court of the United States even since the passage of the Wilson bill, as may be seen by reference to the case of *In re Rahrer*, 140 U. S., 545, cited by Mr. Justice Gary under the name of *Wilkerson* v. *Rahrer*—a case which arose after the passage of that bill—where Mr. Chief Justice Fuller uses this language: "Unquestionably, fermented, distilled, or other intoxicating liquors or liquids are subjects of commercial intercourse, exchange, barter, and traffic between nation and nation, and between State and State, like any other commodity in which a right of traffic exists, and are so recognized by the usages of the commercial world, the laws of Congress, and the decisions of courts"—that, this being so, every citizen of this State has a constitutional right to engage in such traffic, subject, however, to the right of the State government, in the exercise of its police power, to throw such restraints around such traffic by the citizen as may be deemed necessary to protect the morals, health, and safety of the community against the evils incident to such traffic, or, if such traffic is inherently and necessarily injurious to society, may

absolutely prohibit the same—that the dispensary legislation is neither the regulation of the traffic nor a prohibition of the same, but, on the contrary, is a scheme by which the State proposes to monopolize such traffic, to the entire exclusion of the citizen, and to force every consumer who may desire to obtain spirituous liquors for any purpose to purchase the same from the State authorities at such a profit to the State as may be fixed by the designated State authorities, and hence such legislation cannot be regarded as a legitimate exercise of police power; and finally, that any legislation which, like the dispensary law, undertakes to embark the State in trade, is without constitutional authority. I must, therefore, conclude that this dispensary legislation, whether presented in the form of the act of 1892 or in the form of the act of 1893, or both combined, is in violation of the Constitution of the State, and, therefore, null and void, except in so far as the provision in the act of 1892 forbidding the granting of licenses to sell spirituous liquors beyond the time therein limited is concerned.

Having reached this conclusion, it is scarcely necessary to go further and inquire, especially in a dissenting opinion, whether the legislation which has been under consideration violates the Federal Constitution. But I may add, without going into any discussion of the federal question, that it seems to me that so much of this dispensary legislation as purports to forbid a citizen of this State from importing, either from a foreign country or from another State of this Union, any spirituous liquors for his own use, is in violation of sec. 8, art. I., of the Constitution; for it will be observed that even the Wilson bill does not forbid such importation, nor does it authorize any State to do so. On the contrary, its language necessarily implies that liquor may be transported from one State into another, and all that such bill purports to do is to subject such liquor, upon its arrival in a State, to the laws of such State.

Judgments affirmed.